411 So.2d 543 (1982)
Heirs of Marie Cordelia ONCALE
v.
Inez Avet CLEMENT and Claire Clement Shinn.
No. 14568.
Court of Appeal of Louisiana, First Circuit.
March 2, 1982.
*544 Robert G. Creely, of Amato & Creely, Gretna, Richard P. Mire, Houma, for plaintiffs-appellees Heirs of Marie Cordelia Oncale.
John F. Pugh, of Pugh, Lanier & Pugh, Thibodaux, for defendants-appellants Inez Avet Clement and Claire Clement Shinn.
Before COVINGTON, COLE and WATKINS, JJ.
COLE, Judge.
The issue presented here is whether or not a donation inter vivos should be set aside on account of the incapacity of the donor. We find no manifest error in the trial court's conclusion that plaintiffs have proven the donor was of unsound mind, therefore we affirm the judgment setting aside the donation.
The litigation arose from these facts. Marie Cordelia Oncale was an elderly unmarried woman who lived in rural Lafourche parish with her older sister Sidonia. Sidonia died in April of 1978 and approximately two weeks later on April 25, 1978, Marie executed an act of donation in which she donated three pieces of real estate to defendants Inez Avet Clement and her daughter, Claire Clement Shinn.[1] The act was not recorded at that time. Marie Oncale died on April 7, 1979, and the act was recorded on April 9, 1979.
The heirs of Marie Oncale then filed this suit, seeking to have the act of donation annulled for several reasons, one of which was that the donor was of unsound mind and lacked the capacity to understand the consequences of the act. After hearing lengthy testimony from witnesses for each side, the trial court rendered judgment in favor of plaintiffs annulling and setting aside the act of donation. Defendants filed this devolutive appeal.
After reading the entire record we agree with the trial court that the evidence established Marie Oncale was not capable of understanding the nature of the act of donation. All witnesses agreed as to several objective traits of Marie Oncale. One, she spoke very little English. Two, she was totally unable to read or write. Three, she was dominated by her sister Sidonia. Four, she was unable to dial a telephone. However, there was no agreement between the two sides on the subjective issue of Marie's mental ability.
Testifying for the plaintiffs, Judge Remy Chiasson, the son of one of the plaintiffs, stated he had known Marie for years and although she was a good-hearted person, she was not a person who was capable of understanding things. Her reputation in the community was that she was "like a child" or "retarded."
Mrs. Lillian Constant, a relative of Marie's, testified she lived with the two sisters for six weeks when Sidonia underwent surgery. She too described Marie as being somewhat "retarded." Mrs. Constant stated she attempted to show Marie how to dial the telephone almost every day during her stay, but Marie was unable to learn this task. Marie generally had to be instructed as to when to go to sleep, when to get up, when to take a bath, when to eat, and when to do almost every chore. She was able to turn on the television set but would not change the channel. She could not count *545 eggs or make change. She slept fully dressed and would frequently urinate in the bed during the night. The trial court noted in written reasons it was very impressed with this witness' demeanor and her factual recitation concerning Marie's daily life.
Another witness was Mrs. Carmen Waguespack, Mrs. Constant's daughter, who also helped care for the sisters during Sidonia's convalescence. Her testimony corroborated Mrs. Constant's concerning Marie's inability to dial a phone or to care for herself. Mrs. Waguespack stated she had never known Marie to initiate a conversation, i.e., she only spoke when someone spoke to her.
An incident rather illustrative of Marie's mental state was related by Francis Naquin, a plumber, and his helper, Joseph Adams. They both testified they had stopped by to visit Marie one day and inquired about Sidonia. Marie told them she didn't know what was wrong with Sidonia but Sidonia's body was cold and she could not awaken Sidonia. The men entered the house and found Sidonia dead in her bed, her body "ice cold." This incident illustrates the limited nature of Marie's mental capacity in that she apparently did not recognize the obvious signs of death or even if she did realize what had happened she seemed unsure as to what she should do about the situation.
Mrs. Goldie Clement, Marie's cousin, testified Marie never really entered a conversation or made inquiries of her own. When she saw Marie at Sidonia's funeral Marie seemed unaware of or unaffected by the death of her sister.
The picture painted by the defendants' witnesses was entirely different. Belinda Shinn, a registered nurse who worked at the nursing home where Marie spent several months, testified Marie seemed alert and oriented as to time, place and person. Dr. Paul Gaudet, an otolaryngologist (an ear, nose and throat surgeon), testified he treated Marie for a nasal skin cancer. He admitted he dealt with her for a total time of only an hour and a half, but he found her to be mentally capable of understanding what he was saying, with the help of an interpreter.
Mrs. Eves Landry, a neighbor of Marie's, testified there was nothing wrong with Marie's mind. She would instruct Marie to watch certain television programs and Marie would do so. She stated Marie took care of the house both before and after her sister's death. Sidonia would not allow Marie to talk when visitors came, but would require Marie to simply sit in her chair and be quiet. She believed the reason Marie could not dial the phone was because her sister never taught her to do so and because she was uneducated.
Mr. Wildon J. Shinn, Jr., husband of defendant Claire Shinn, stated he recalled seeing Marie at Sidonia's funeral and she appeared to be upset about her sister's death. Mrs. Amelia Heck, daughter of defendant Inez Clement and sister of defendant Claire Shinn, said although she barely spoke French, she could communicate quite easily with Marie. According to Mrs. Heck, she and Marie had normal conversations about everyday matters and Marie often initiated these conversations on her own. She said Marie could care for herself and did not need help with everyday chores. Another sister of Claire Shinn, Janet Clement, corroborated this testimony by saying she too had always been able to communicate with Marie, even though there was a language barrier.
Dr. Billy Hillman, accepted by the court as an expert in the general practice of medicine, stated he had treated Marie since 1961. He described her as being "slow mentally," although part of her problem may have been caused by her lack of education and her language barrier. He opined she also suffered from some "congenital or birth slowness" and noted the older sister was clearly the dominant figure in the family. He felt Marie was able to carry out his instructions regarding medicine although he noted Sidonia always accompanied her to his office and always spoke for Marie. He remarked Marie gave the impression of not being "all here."
The final defense testimony was provided by Claire Shinn, one of the defendants. *546 She testified Marie indicated she wanted to speak with her attorney about the disposition of her property. Mrs. Shinn and her mother took Marie to the law office of Mr. Walter Lanier where the matter was discussed. They later returned to the office and the act of donation was executed. Mr. Lanier read the act in English (in the presence of two witnesses), explained it to Mrs. Clement in laymen's terms, and Mrs. Clement translated to Marie. When asked why the act was not recorded until after Marie's death she said they were worried family members might harass Marie about the matter and they were concerned her S.S.I. benefits might be terminated.
We realize several of the witnesses in this case are related to either the plaintiffs or the defendants and therefore have at least an indirect or a potential interest in the outcome of this lawsuit. Although this makes for a less than ideal situation it is almost unavoidable in a small rural community. Naturally, when the issue is a personal one such as a person's mental capacity, it is the relatives of that person who can provide the necessary information. As always, the trial court enjoys the superior vantage point in determining the credibility of witnesses. While this court is limited to a reading of the "cold" record, the trial court has the benefit of observing the demeanor and attitude of each witness. Where evidence is conflicting, as it is in this case, the appellate court should not disturb the trial court's reasonable evaluation of one set of witnesses as credible, and its consequent rejection of testimony of the opposing set of witnesses. Billiot v. Bourg, 338 So.2d 1148 (La.1976). The trial court's reasons (thirteen pages in length) reflected detailed notes from the trial and very accurately summarized the testimony of each witness. We respect the court's conclusion that plaintiffs proved by a preponderance of the evidence Marie Oncale was of unsound mind and therefore incapable of understanding the nature of the act she executed.
The appellants (the donees) contend the appellees (the heirs) have no legal right to challenge the validity of the act because of La. Civil Code art. 403. The article reads as follows:
"After the death of a person, the validity of acts done by him can not be contested for cause of insanity, unless his interdiction was pronounced or petitioned for previous to the death of such person, except in cases in which the mental alienation manifested itself within ten days previous to the decease, or in which the proof of the want of reason results from the act itself which is contested."
Since none of the three conditions specified above were met in this case, appellants contend there can be no valid attack. We disagree for two reasons.
First, we do not believe this article applies to donations. This was stated by our Supreme Court in Succession of Lanata, 205 La. 915, 18 So.2d 500 (1944), and in Marie v. Avart's Heirs, 10 Mart. (O.S.) 25 (La.1821). We note both cases deal with donations mortis causa but we find the reasoning applicable to cases involving donations inter vivos.[2]
Secondly, we find it inequitable to apply this article to the present situation where it would have been impossible for the heirs to attack the act prior to the death of the donor, because the donees kept the act a secret and failed to record it. Mrs. Shinn admitted under oath one of the reasons for not recording the act until after Marie's death was to avoid challenges from family members. Under these circumstances we would not prevent the plaintiffs from attacking the act on the basis of this article.
The more applicable code article is art. 1475 which reads, "To make a donation either inter vivos or mortis causa, one must be of sound mind." We conclude the evidence showed Marie Oncale was not of sound mind and therefore the act should be annulled.
*547 For these reasons, the judgment of the trial court is affirmed. Defendants-appellants are to pay all costs.
AFFIRMED.
"APPENDIX TO NUMBER 14,568"
A certain tract of land situated in the Parish of Lafourche on the left bank of the Bayou Lafourche, at about eighty arpents from said Bayou and at about 5 or 6 miles from the Town of Thibodaux, measuring One and three-quarters arpents in width by about Fifteen arpents in length, bounded above or west by lands of Leonie Naquin, below or east by lands of Estate of Leon Traigle, North by lands of Bowie Lumber Co. Ltd. and South by the Laurel Grove Plantation, being the lower half of the lower half of Lot number Three, in section No. One Hunderd and seven, in Township Fourteen, Range Sixteen, East; together with all the buildings and improvements thereon and all the rights and privileges thereto belonging.
Being the same property acquired by Zephirin Oncale by inheritance from his father and mother, Oscar Oncale and Seraphine Gros, deceased, and by purchase from Oliver Oncale et al by deed dated June 21, 1918, recorded June 21, 1918, in Conveyance Book 49, Folio 363, under Entry No. 2568 of the records of Lafourche Parish, Louisiana.
A certain tract of land or lot of ground, situated in the Parish of Lafourche, on the left bank of the Bayou Lafourche, at about five or six miles from the Town of Thibodaux, and at eighty arpents from the Bayou Lafourche, in the Choupic Settlement, measuring ONE arpent front towards Bayou Lafourche, by ONE arpent in depth; being a portion of Lot No. 3 of Section No. 107, in Township 14 S.R. 16 E.; bounded in front or towards Bayou Lafourche and above by lands of the Laurel Grove Plantation, below by lands of the vendee herein, and in the rear by lands of Leonie Naquin and others; together with all the buildings and improvements thereon.
Being the same property acquired by Zephirin Oncale from Frank Gros et al by deed dated February 27, 1933, recorded February 27, 1933, in Conveyance Book 69, Folio 211, under Entry No. 24270 of the records of Lafourche Parish, Louisiana.
A certain tract of land situated in the Parish of Lafourche, on the left bank of Bayou Lafourche at about five or six miles above the Town of Thibodaux, and at eighty arpents from said Bayou Lafourche, measuring one arpent front towards said Bayou Lafourche, between parallel lines, by fourteen arpents, more or less, in depth, bounded above by Laurel Grove Plantation and below by property of Zephirin Oncale; together with all the buildings and improvements thereon.
Less and except, however, a certain lot of ground measuring one arpent front by one arpent in depth, sold by Mrs. Adolph Boudreaux and Mrs. Leonie Naquin to Frank Gros on January 6, 1917, (See C.B. 47, page 386), and less and except also, a certain lot of ground measuring two hundred sixty (260) feet front on the public road leading to Bayou Lafourche and forty-five (45) feet front on the Choupic Road, sold by Mr. and Mrs. Leonie Naquin to Henry Clement on January 10, 1921, (See C.B. No. 22, page 153, and C.B. No. 47, page 387).
Being the same property acquired by Donor by inheritance from her father and mother, Zephirin Oncale and Mrs. Sidonia Boudreaux Oncale, and from her brother and sister, Walter Oncale and Sidonia Oncale.
NOTES
[1] The properties are fully described in the appendix to this opinion.
[2] We observe that in our civil code donations inter vivos and mortis causa are treated together in Book III, Title II.